Mr. Flagstone Development, we have, is it Mr. Petty for appellants? That's correct, Your Honor. Russell Petty representing the plaintiff, appellant, and cross-appellate. And for appellees, we've got Mr. Parker, is that right? Yes, Your Honor. Well, welcome to both of you. In commending Seattle Council, I don't want to be disparaging California and Montana Councils. We have excellent advocacy from all these states. We certainly took no insult from the Court's remarks, but thank you, Your Honor. May it please the Court, my name is Russell Petty, and I'm representing the Flagstone Development as well as Mr. Heath. This case has been pending for over 11 years. This is our second trip to the Ninth Circuit. Over the course of those 11 years, my clients have received a number of erroneous evidentiary and procedural rulings, but significantly have been successful on those occasions where they've been allowed to take a matter before a jury. I submit, Your Honors, that the case has gone on long enough, and the time for procedural machination should be over, and respectfully ask this Court to remand this matter with instructions that we be allowed to take our claims before a jury. In addressing the various errors that occurred below, I have to start someplace, so I'll start at the tort claims, which, in spite of the fact that there was never a ruling that there was anything wrong with any of our tort claims, nonetheless somehow went away. Procedure is important, Counsel, particularly in this case where you've been up and down before, and we have a prior disposition from another panel of this Court, and as I read the scope of that prior disposition, the remand was on the breach of contract claim only, right? Well, I mean, but that was, Your Honor, the only ruling. I mean, if you look at the district court's summary judgment ruling in Flagstone 1, the only substantive ruling made is that the contract had been abandoned, and there was no discussion of the tort claims. There was only one fairly cryptic line that said something to the extent that the, without a valid contract in existence, the claims against Wayne Joyner, Justin Joyner, and RMT fail. Now, that was a, probably a reference to the tort claims, because it used claims in the plural, and there's only one breach of contract claim, and, of course, the breach of contract claim was not against the Joyners. So my question to you is, why isn't that waived, all the tort claims? Because you had the opportunity to address it during the first round of briefing, the first time you were up here before the Ninth Circuit, and you didn't do that. Well, Your Honor, as I was attempting to point out, the only ruling that the district judge made was abandonment, and then the only reasonable reading of that order is tying the tort claims into abandonment, because there's no other ruling with respect to the tort claims, but yet they were included in the judgment. So in addressing, you know, before this court, the only ruling that the district court made, which was abandonment of the contract, when this court in Flagstone 1 reversed the district court's ruling that there were no material issues of fact with respect to abandonment, it necessarily revived the tort claims, because the only basis for the dismissal of the tort claims under any reasonable reading of the Flagstone 1 summary judgment order was that abandonment also extinguished the tort claims. So if you say, well, abandonment is no longer, you know, is no longer valid, then, you know, how is it the tort claims can't come back? At any rate, Flagstone addressed on appeal every substantive ruling that the district court made with respect to the, you know, RMT and its claims. And so, you know, and this court properly in Flagstone 1 only addressed those rulings that were actually made. I submit there was no need to argue hypothetically about rulings the district court did not make. And so I submit that it. And, Your Honor, with respect, I mean, what did happen to the tort claims? I mean, there was never a ruling that, well, you know, they violated statute of limitations or there was insufficient evidence or anything with respect to that. Now, if we don't tie those tort claims into the abandonment issue, what that means, in effect, is somehow they were included in the final judgment by happenstance or mistake. And, you know, maybe Mr. Counsel for RMT could address this. But, you know, there's no reason for those claims to have gone away other than they were tied to abandonment or there was just mistakenly included in the judgment. And I submit that in the event that they were mistakenly included in the judgment, which is the only other alternative, that this court should order its discretion under Singleton v. Wolfe and hear those issues anyway, because otherwise it's just a simple miscarriage of justice. Moving on to the expert witnesses. I don't think there's any serious dispute that the exclusion of Ms. Zachary was error. She was not a specially retained expert. Because she was not a specially retained expert, she had no obligation under the federal rules to write a report. The judge excluded her for the sole reason that she didn't write a report, that she never had any obligation to write in the first place. And I don't think that RMT disputes that that ground for exclusion was improper. Instead, RMT argues, well, you know, there were other grounds that the district court could have excluded her on. She wasn't really a proper expert. She never issued any opinions. And I really think that, you know, rulings like that by the district court are discretionary. I think it's probably a mistake to speculate as to how the district court would have exercised its discretion. And beyond that, I think what Ms. Zachary did was entirely proper. What she did was she created a document, a spreadsheet, that compared the prospectus that had been done by Flagstone with the cash flow projections that had been done by Mr. Joyner and RMT in order to ascertain that basically the numbers were very similar. The prospectus was already in evidence. And the Flagstone prospectus and the cash flow projections by Mr. Joyner and RMT are clearly in admission. There was another expert, counsel. I'm sorry for interrupting you. I have a question regarding Ms. Zachary's report. During the first appeal, there was an expert by the name of Grabois who had his expert report excluded because there was no independent basis for his calculations. Doesn't Ms. Zachary's opinion suffer from the same deficiency? Well, no, Your Honor. Well, I mean, in part, she wasn't doing an opinion. She was merely just comparing the prospectus with the cash flow projections. But the cash flow projections, Your Honor, they don't need a foundation. Admission by a party opponent, the law of this court as well as other courts, is that when an opponent testifies or provides some information or has provided information in the past about the value of a piece of property, that it doesn't matter whether there's an adequate foundation for that opinion or that statement because this is something which is taken care of by the adversary process. And here, RMT and Mr. Joyner created this cash flow projection for the purpose of obtaining financing. They used it in front of third parties for their own benefit, and they shouldn't be allowed at this particular point in time to walk away from that representation that they made. And certainly there's been no ruling by anybody that the cash flow projection is not an admission. And, you know, beyond the fact that we don't need a foundation for that cash flow projection, I submit that we could probably build one if we had to. We have never given an opportunity to do so. But Mr. Joyner is an extremely experienced developer of ranch land, I mean probably the most experienced developer of ranch land in the state of Montana. And he both in that cash flow projection and in numerous e-mails that went back and forth between the parties and between RMT and the financier made numerous statements about the expected profits from the development, and all of those are admissions and all of those should be admissible. And the jury may not accept them. You know, that's certainly a possibility. Just because something's admitted into evidence doesn't mean the jury is going to agree. But there's no question about the fact that we should have had an opportunity to put this evidence in front of a jury, and it shouldn't have been taken away from us on the dismissal. Turning real briefly to Mr. Foley, there were at various points the district judge gave four reasons why, you know, why his report was insufficient. He didn't state his compensation, which, in fact, is there in the report. I mean it's on the very first page of the report. He didn't state his prior testimony. Well, you know, he didn't have any prior testimony. You know, he did, as a matter of fact, state that he'd never testified. That was also in the initial report. He hadn't had any publications. He didn't disclose his publications, but he had no publications to disclose. And the district judge also indicated he didn't describe or indicate the data he relied on. Well, there was 18, you know, various documents that are listed in the report that he had relied on. So, I mean, that also was incorrect. The district judge then indicated in a subsequent ruling, well, you know, I can't ascertain from looking at his report alone whether his testimony is reliable. I submit to the court that that's wrong both as a matter of fact and as a matter of law. It's wrong as a matter of law because, you know, the report is not, you know, under the Seventh Circuit Walsh case. The report is not for the purpose of reciting, you know, word for word what the experts chose to say, but simply provide fair notice to the other side. And the report was more than adequate to do that. And, you know, we've got one of the things that Mr. Foley was going to testify on was the cost of constructing roads. I mean, it says in his report that he personally has supervised the construction of hundreds of miles of similar roads. I mean, there's nothing, you know, mysterious about, you know, having done something in the past, having costed something in the past and applying that experience to the roads in this case. If I could interrupt you just a minute. Yes, please, Your Honor. I know the district court did not address this, but I have a concern about the Montana statute that seems to suggest that with respect to the breach of a contract to convey real estate, lost profits are not available. And the knucklehead opinion from the Supreme Court of Montana seems to confirm that. What's wrong with my analysis? Well, Your Honor, what's, I mean, not wrong, but I mean, there have been numerous judicial decisions with respect to the sale of property, which simply haven't looked to that. Well, and those numerous opinions are all prior to knucklehead and involve, as I read them, involve issues in the contract other than the mere conveyance of real estate. There was in one of them there's cattle involved and other issues. So I really don't understand why knucklehead is not controlling in this case. Well, because knucklehead was, first off, I mean, if the Montana statute was applied to all real estate, what the Montana statute does, and we're talking 27-1-314, and it limits damages to the cost of examining title and the price paid for the property. I mean, if that was, in fact, the law in Montana with respect to real estate cases, you know, you couldn't have option contracts, you couldn't have earnest money contracts. It would make those essentially, you know, a situation where, you know, the day before a property was supposed to close, somebody can just walk away from the property and pay only minimal if any damages, any damages whatsoever, which is why the other courts dealing with property loss have applied a, you know, an additional, you know, different standard, which is that for damages for breach of an agreement to sell property, you're entitled to any detriment caused thereby. I noticed the knucklehead case was a very unusual fact pattern, too, Your Honor, and it basically lends into our argument that the statute that we're talking about is really only a protection for title companies because that's what was exactly taking place there. What happened to knucklehead is the sale did not go through because the title company that was running the sale had a concern as to whether the sale, the title was valid because of an IRS lien, and so they canceled the sale. They had another sale. Knucklehead was not the lower bidder at that and complained. Well, you know, that wasn't a contract to sell property because none of the parties actually owned the property. This was a failure to deliver clear title, which is what the statute says, and I submit the use of the word failure to deliver clear title is indicative that it's really designed to, excuse me, an estate in land, not clear title, but an estate in land is indicative of the fact that it's designed to protect title companies. Thank you, sir. With that, Your Honors, I'll submit. Thank you very much. May it please the Court, my name is Mark Parker. I'm here for Wayne Joiner, Justice Joiner, and Rocky Mountain Timberland. The knucklehead case is controlling, so is the statute upon which it is based. Why didn't the district court even mention the statute or knucklehead? I don't know. The district court, in my mind, properly excluded the experts and found that a claim for lost profits was sufficiently speculative that it threw it out on that basis and never got to address knucklehead case or the statute upon which it relied, although it had been cited, of course, by us in our briefing. We had raised it. And so that's my best explanation on why the court didn't address the issue, but it still is controlling under the doctrine of right ruling wrong reason, or as they say in many state courts, it's called the tipsy coachman rule in many state courts. I've never seen the Ninth Circuit refer to it as that. But we believe the knucklehead case is controlling. We believe that it is not an easy task to defend the exclusion of Foley for the perceived deficiencies in his report. I think we have to concede that the report was probably sufficient and that the district court erred in kicking the report out on that basis. But Foley's testimony was not going to help or hurt anybody because Foley's testimony was simply that the project was feasible from the fact that the right number of architects and engineers could have constructed a project like that. He did not have anything to do with whether it was profitable or not. And, in fact, one of the reasons we didn't move to exclude him is at trial he would have had to testify that his project that he envisioned did not have any economic feasibility. We believe that's where we would have gotten him. So as for Zachary, she was not an employee of this company. She never was an employee because this company never had any employees. Flagstone had an officer and director, Mr. Heath. I don't think it ever had any employees, no evidence of it. Zachary was an accountant. I flew down to Scottsdale to take her opinion, her testimony, and she walks in and says, I have no opinions. I've never had that happen before. And if you're a trial attorney, it doesn't happen very often. And she said she had no opinions. And she took two spreadsheets, I suspect, and ultimately said that they looked like they would be about the same, but irrelevant. So she did not have any opinions. Her exclusion was harmless because she didn't have any opinions to offer. But it doesn't matter. Exclude Mr. Foley, put Mr. Foley and Mr. Zachary back in the case, and you still are not entitled under Montana law to get profits under a case like this. Now, the suggestion is that the world will come to an end if the court interprets the statute as it is written, but that's for the legislature and us Montanans to worry about. Assuming counsel that lost profits is recoverable and assuming that the district court didn't abuse its discretion in excluding the experts, could the plaintiffs show damages in other ways, for example, in reliance on the exhibits, including the cash flow model? I don't believe so, Your Honor, and this is why. When we were here the last time, we did not know for sure whether or not Judge Siebel's order, partial summary judgment, excluding the right to seek lost profits, we did not know whether or not that order was a partial summary judgment or a full summary judgment because we did not know the full extent of what the plaintiff's claim was going to be. But when we get back on remand and gear up for the final trial, the final pretrial order that we both agreed to said that the only claim they had was lost profits. Well, at that point, when the final pretrial order, we're going into the damage trial, the only claim is for lost profits. That makes the ruling that no lost profits are available, that makes it a full summary judgment, and then the case is over. So I do believe that other costs might have been recoverable under this statute, but by the time we get up to the edge, right before trial, or as we were scheduling the trial, the pretrial order said the only claim they wanted was lost profits. So that was the end of it. I think the essential question to me, and I don't want to interrupt Judge Wynn, but whether these, and when you take those 18 documents, as I see it, you really boil them down to two documents. There's the prospectus and the cash flow analysis. Right. Without experts, those two documents are enough to get to a jury? No. Why not? Well, first of all, we don't clearly know where some of those numbers came from. Secondly, all those cash flow analysis has a lot of ifs to get there, and every one of those ifs is speculation squared. If you came up with the money to buy the project, well, Mr. Heath never was going to come up with the money to buy the project. That testimony is uncontroverted. He was going to have to go find some other investor to put up the money. Someone else was going to have to buy it. That person has never walked into a courtroom, never raised their right hand and said that they had the money. So we're really speculating as to whether or not to make the down payment. Then you have to speculate as to whether or not anyone is going to loan them the money. The testimony was uncontroverted that there was not a lender. So then you have to speculate. Are those questions for the jury? No. Mr. Heath admits them. Mr. Heath admits that in many of these. The cash flow model and the prospectus and a lot of the documents were prepared by the RMT parties, right? Some of them were, yes. Some of them were. However, there is no speculation as to the fact that Mr. Heath's counsel, there's no speculation as to the fact that those were based upon what Mr. Joyner had in mind for the property. That's uncontroverted. But there's also no speculation about the fact that Mr. Heath's attorney wrote Mr. Joyner and said that it should stop all work on the project, stop all activity in the next 12 days. Stop. He told them to stop. And that's in the excerpts of the record, page 91 to 96, referred to at page 9 of our brief. And so Mr. Joyner, and then three months after that, Mr. Heath writes to his investors and say, it's not official yet, but we're working to extract ourselves from this transaction, largely due to county over-regulation. And he goes on. Behind the scenes, Mushoefield County brand new planner, Ann Cossett, has convinced the planning board and commissioners that the county has significant liability unless all the roads are professionally engineered and stamped. This triples road construction, costs the plan development, and makes the project economically unfeasible. Now, if you're writing your bankers and your investors saying that the project is economically unfeasible, there's no speculation about the fact you're not going to get investors and bankers. And when you tell the guy that did the pro forma and did the spreadsheets that went into the big stack of exhibits, when you tell him we're not going to do it your way, and you have a letter from your attorney threatening him if he tries to do it his way, there's no speculation that all of the components that could lead to Mr. Joyner's pro forma ever even being relevant have been pushed off the table by Mr. Heath himself by saying that we're going to do it a different way, telling his bankers and his investors that the project is economically unfeasible. Wouldn't you characterize those two documents basically as blue sky anyway? Yes. You're trying to raise money. Yes. Well, I probably inappropriately last night said, and maybe even more inappropriately repeated here, I agree with you, that it's almost like an ad for a car. You know, I went and bought a brand new Mustang. A year later, I don't have a girlfriend yet. What's wrong? I saw the ad. I mean, you just. . . Well, you should have bought a Porsche. I should have. I'm a defense counsel. So Mr. Manning here has helped us out with the brief. He's said about everything I need to say in the brief. And unless there's any questions, I do believe that there is nothing under Montana law that would allow you to get speculative damages, to get lost profit damages anyway. It's just barred as a matter of law. It's clear as a bell in the statute. And with respect to the tort damages, the tort claims were that Judge Siebel's order wiped out the tort claims. This Court affirmed it and remanded only on the breach of contract claims. It says it right here. You know, we remand for further proceedings on the breach of contract issue. So everything but the breach of contract claim came out of this Court for review by Judge Haddon. Once we learned that only lost profits were a component of the damage claim they were taking to that last jury, Judge Haddon appropriately, but maybe for the wrong reason, granted our motion for summary judgment. Thank you for your time. Thank you. Okay, I think appellants have concluded their argument. And so unless there are questions from the panel, the Flagstone Development v. Joyner case shall be submitted.
judges: Gould, Nguyen, Presnell